*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| BRET BOHN, | ) |
| | ) Supreme Court No. S-17106 |
| Appellant, | ) |
| | ) Superior Court No. 3AN-15-10274 CI |
| v. | ) |
| | ) O P I N I O N |
| PROVIDENCE HEALTH SERVICES – WASHINGTON, | ) |
| | ) No. 7517 – April 16, 2021 |
| | ) |
| Appellee. | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Erin B. Marston, Judge.

Appearances: Mario L. Bird, Ross, Miner & Bird, LLC, Anchorage, for Appellant. Chester Gilmore, Cashion Gilmore LLC, Anchorage, for Appellee.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

CARNEY, Justice.

## I.     INTRODUCTION

A patient who sued a hospital for alleged violations of Alaska's Health Care Decisions Act (HCDA)[1] challenges the superior court's application of the HCDA's statutory immunity provisions to the hospital. The patient argues that the hospital

---

[1]     AS 13.52.010-.395.

violated the HCDA when it temporarily assumed decision-making authority over his medical care while he was incapacitated and treated him without his consent or that of his parents, whom he had previously authorized to make medical decisions on his behalf if he were rendered incompetent or incapacitated.

The hospital argues that it is entitled to immunity under the HCDA because it held a good faith belief that the patient's parents lacked authority to make medical decisions for him, based on conduct that convinced health care providers at the hospital that the parents were not acting in the patient's best interest. The superior court agreed with the hospital and granted its summary judgment motion, concluding that the immunity provisions applied.

This is the first opportunity we have had to interpret the HCDA's immunity provisions. The superior court concluded that the hospital was entitled to immunity because its doctors had acted in good faith and in accordance with generally accepted medical standards. But the court overlooked the requirement for specific good faith as to the *authority or lack thereof* of the patient's surrogate or agent. We therefore reverse the grant of summary judgment and remand for further proceedings.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

In 2007 Bret Bohn executed a Durable Power of Attorney for Healthcare.[2] He wanted his parents to have the authority to make medical decisions on his behalf if he became "incompetent or incapacitated." He named first his mother and then his father as his health care agents. The power of attorney stated: "I want my life to be prolonged and I want life-prolonging treatment to be provided unless, in my Agent's judgement,

---

[2]    AS 13.52.010(b) ("An adult may execute a durable power of attorney for health care, which may authorize the agent to make any health care decision the principal could have made while having capacity.").

the pain, discomfort, or probable outcome of the treatment outweighs any benefit the treatment may have for me." In another document Bohn nominated his father as his guardian in the event a guardian needed to be appointed.

### 1. Bohn's admission and treatment at Providence

In early October 2013 Bohn, then 26 years old, started to experience insomnia while guiding a hunt. He believed the insomnia was caused by his prescribed use of the steroid prednisone to treat nasal polyps. The insomnia persisted after he returned from the hunt; he also began experiencing disorientation and hallucinations. On October 16 Bohn's parents took him to Providence Alaska Medical Center, where he was prescribed sedatives and then released. He began experiencing seizures the next evening after taking the sedatives.

Bohn's symptoms worsened and on October 19 he returned to Providence, where he was admitted and remained until late March 2014. Hospital records state that when he was admitted he "was unable to clearly answer questions or describe his experience" and that he was placed in psychiatric observation. His condition continued to deteriorate and he suffered more seizures after admission, which Bohn suggests were a side effect of a dose of the antipsychotic drug haloperidol. The following day he was transferred to the emergency room after staff observed that he was perspiring heavily, had an elevated pulse and temperature, and had low blood oxygen saturation. During this time Bohn seemed to be unable to make medical decisions on his own behalf.

Bohn posits that his psychiatric and other symptoms were caused by neuroleptic malignant syndrome (NMS) resulting from the steroids and the haloperidol he had been given.[3] He points out that his condition seemed to improve between the

---

[3] Bohn obtained reports from independent physicians noting that certain antipsychotic drugs, including haloperidol, can sometimes cause NMS. NMS is
(continued...)

afternoon of October 20 and October 22, when Providence temporarily stopped administering antipsychotic medications and steroids. He suggests that, for at least some of this time, he was competent to give or withhold consent to medication. Chart notes entered by multiple Providence doctors in the days after Bohn's admission indicate that steroid use may have caused his altered mental state and psychosis and that haloperidol may have caused or exacerbated his seizures. The medical records do not, however, indicate a conclusive diagnosis. Providence characterizes Bohn's condition as "exceeding[ly] difficult to diagnose."[4]

In the weeks that followed providers gave Bohn multiple doses of steroids and antipsychotic medications, including haloperidol and risperidone. He was treated by a number of physicians. His psychiatric state did not improve, and Providence records indicate that his delirium persisted and that he remained "effectively catatonic" as of March 2014.

### 2. Bohn's parents' efforts to halt treatment and meeting with Providence staff

Throughout late October and early November 2013 Bohn and his parents, especially his mother, repeatedly sought to prevent health care providers at Providence

---

[3] (...continued) characterized by fever, signs of autonomic dysfunction such as profuse sweating and elevated heart rate, and a movement disorder. Bohn points out that his symptoms were consistent with NMS.

[4] The extent to which Providence considered NMS as a diagnosis is unclear. A summary of Bohn's symptoms and treatment during his stay at Providence notes that his symptoms could have been caused by numerous conditions, including a mental disorder. NMS was mentioned as a possible condition in March 2014, just before Bohn was transferred to another hospital, but otherwise does not appear to have been considered.

from administering medications to him. His parents disagreed with the doctors' decisions, believing that the medications were causing his symptoms.

Providence medical records indicate that on October 23 Bohn's mother attempted to physically restrain Bohn on two occasions. According to a friend of Bohn's who was present, his mother was "holding [him] back and feared that he could harm somebody," possibly as a reaction to being "medicated . . . against his will." But a note by a Providence doctor states that Bohn "was not being threatening" and that his mother continued to restrain him "despite repeated requests" from Bohn's father and multiple doctors that she stop. Later that day Bohn's parents attempted to remove him from the hospital but, according to Providence's records, a doctor explained that Bohn was "not medically stable" enough to be discharged. On October 24 Bohn's parents sought representation from an attorney.

On the morning of October 25 Providence held a meeting with Bohn's parents, several Providence providers (including two doctors and a social worker), and a Providence security guard. Providence informed Bohn's parents that it was restricting their visits to one hour per day, with no cell phones, and with Providence staff present. Bohn later alleged that at this meeting Providence staff told his parents "that an institutional decision had been made by Providence that [Bohn] was incapacitated and that Providence would thereafter be making all health care treatment decisions."

According to notes kept by Bohn's parents, Bohn's mother notified Providence staff on October 25 that Bohn had executed a power of attorney naming his parents as his agents. But a doctor's note in Providence's records from that day states that, as far as Providence providers and risk management staff knew, Bohn "ha[d] no designated [power of attorney]," and that although Alaska law would normally make his

parents his surrogate decision makers,[5] "[h]is parents are unfortunately interfering in his medical care." Another doctor's note from the same day states: "Medical team is [Bohn's] surrogate decision maker[]. Parents not acting in best interest of patient."

### 3. Guardianship appointment

Providence's records for later on October 25 indicate the hospital received a call from Bohn's parents' attorney "stating that [Bohn's] mother has verbalized multiple times that she would like [Bohn] to commit suicide rather than be hospitalized." Based on this call and Bohn's mother's previous conduct, Providence sent a report of harm to Adult Protective Services (APS), stating that it believed Bohn was at risk of neglect because his mother "ha[d] been interfering with [his] medical care, . . . ha[d] attempted to remove him from the hospital against medical advice," and was "observed physically assaulting and restraining [Bohn]" despite medical staff's requests that she stop.

On October 31 Bohn's parents provided Providence staff the power of attorney Bohn had executed and requested copies of Bohn's medical records. According to APS records Providence notified APS of the power of attorney that same day and stated that Providence's risk management staff "would be reviewing the mother's [power of attorney] document and will provide guidance to the doctors as to how to proceed."

---

[5] *See* AS 13.52.030(a) ("[A] surrogate may make a health care decision for a patient who is an adult if an agent or guardian has not been appointed or the agent or guardian is not reasonably available, and if the patient has been determined by the primary physician to lack capacity."); AS 13.52.030(c) (listing patient's family members who may act as surrogate absent designation by patient in order of priority, including parents).

-6- 7517

On November 5 APS filed a guardianship petition in superior court.[6] APS acknowledged the power of attorney naming Bohn's mother as his agent but argued that "her current decisions and interference with his medical care ha[ve] caused great concern."

On November 9 Bohn's mother sent Providence a letter seeking "emergency evacuation" of Bohn to "any other medical health facilities."[7] A Providence risk management specialist responded that "the physicians treating him are exploring the option of transferring him to another facility but are awaiting" certain test results and that "[t]he transfer of a patient is something that is done by the physician and can only occur if there is a physician willing to accept the patient as their own at the new facility." Providence directed Bohn's mother "back to the physician treating [Bohn] to see what the status is" on the pending test results.

An emergency guardianship hearing was held before a magistrate on November 14. Bohn's parents were not present and there is no indication that they received notice of the petition or hearing. Bohn's sister and a close friend who had frequently visited him in the hospital also were not present; both later attested that they would have been willing and able to act as Bohn's surrogate or guardian. Following the hearing, and apparently based on a joint stipulation from APS's attorney and Bohn's court-appointed attorney, the magistrate recommended that the Office of Public Advocacy (OPA) be appointed as a temporary guardian for Bohn. Superior Court Judge Erin Marston approved the temporary guardianship order the same day, suspending Bohn's power of attorney documents pending further court order.

---

[6] *See* AS 13.26.311(a) (providing for court appointment of guardian for incapacitated person).

[7] Bohn's mother had previously asked that Bohn be transferred either to the Alaska Psychiatric Institute or to Alaska Regional Hospital.

In a later order granting full guardianship to OPA, the court found that although Bohn's parents would normally have priority for guardianship, appointing OPA was in Bohn's best interests because "it would be wrong to appoint the parents as a guardian when they don't believe a guardianship is necessary[,] nor do they believe in the medical diagnosis that their son is 'gravely ill' [or] . . . think he should receive any medications."[8]

### 4. Transfer, removal from hospital, and discharge

Throughout late 2013 and early 2014 Bohn remained hospitalized at Providence. His parents continued their efforts to prevent administration of medications and to contest the guardianship appointment.

In late March 2014 Providence transferred Bohn to Harborview Medical Center in Seattle, Washington. According to a report Bohn obtained from an independent psychiatrist who reviewed Providence's and Harborview's medical records, Harborview planned to administer electroconvulsive therapy. Bohn's parents removed him from Harborview on April 22 in what Bohn later characterized as a "decision to surreptitiously assist in an escape" prior to the administration of electroconvulsive therapy. The police apprehended Bohn and his parents three days later and returned Bohn to Harborview, where he was assigned a new medical team.

Bohn's condition had apparently improved during the three days he spent outside Harborview, during which he took no medications. According to the independent psychiatrist's report, Harborview administered no medications to Bohn after

---

[8]     *See* AS 13.26.311(d), (f) (providing that patient's nominated agent, relatives, and close friends who have "demonstrated a sincere, longstanding interest in the welfare of [the patient]" take priority in guardianship appointments over public guardian, unless court makes written findings that deviating from statutory order of priority is in patient's best interests).

his return except an anti-anxiety medicine; he was discharged in early May after tapering off the anti-anxiety medicine. Bohn asserts that his recovery after his "escape" from Harborview and cessation of all medications demonstrates that his catatonia and other symptoms were caused by Providence's "misdiagnoses and negligent prescriptions of medications."

## B. Proceedings

### 1. Complaints and relevant motions

In October 2015 Bohn filed suit against Providence Health & Services – Washington, the corporate owner of Providence Alaska Medical Center,[9] as well as against OPA employees and several individual health care providers, including a number of Providence employees and some providers from other facilities who were involved in his case. He alleged that Providence administered medication on several occasions over his parents' opposition, violating his rights under the HCDA "to have his parents participate in surrogate decision making."[10] He also brought claims based on negligence, false imprisonment, administration of medication without consent, breach of contract and the implied covenant of good faith and fair dealing, and purported violations of federal law.

Bohn dismissed some claims and the superior court granted summary judgment dismissing the claims against one physician. In November 2016 the remaining individual physician defendants moved for summary judgment. They pointed out that

---

[9] For ease of reference we refer to the corporate defendant simply as "Providence."

[10] AS 13.52.010(b) ("An adult may execute a durable power of attorney for health care, which may authorize the agent to make any health care decision the principal could have made while having capacity."); AS 13.52.030(a) ("[A] surrogate may make a health care decision for a patient who is an adult [and who lacks capacity] if an agent or guardian has not been appointed or . . . is not reasonably available.").

one of the physician defendants, Dr. Harold Johnston — the director of Providence's Family Medicine Residency — had attested in an affidavit that the treatment Bohn received was "well within the accepted practice and standard of care." They argued that Bohn's malpractice claims against them required him to prove that they had breached the relevant standard of care and that he had no admissible expert testimony to counter Dr. Johnston's affidavit.[11] Bohn did not oppose the motion but instead agreed to dismiss the claims against the individual physicians with prejudice. The order of dismissal also granted leave for Bohn to file an amended complaint and specified that he could still recover against Providence for its employees' actions. In a separate order issued three days later the court also concluded that because Providence had joined the doctors' summary judgment motion and continued to assert that it was entitled to summary judgment on the same grounds, the motion was not moot. The court also found that Bohn was not required to present expert testimony to overcome summary judgment on the HCDA claims and that those claims stood.

Bohn then filed a Second Amended Complaint in January 2017, maintaining his HCDA claims against Providence but not asserting any malpractice claims. He also opposed the summary judgment motion that Providence had joined. In February he moved for partial summary judgment as to liability on three of his claims: (1) that Providence violated the HCDA by not cooperating with his parents' attempts to take him out of the hospital or have him transferred; (2) that administration of

---

[11]     *See* AS 09.55.540(a) (requiring plaintiff in medical malpractice action to prove by preponderance of evidence that defendant failed to exercise care ordinarily exercised by health care providers in relevant field and that plaintiff suffered injuries as proximate result of defendant's lack of care); *Hagen v. Strobel*, 353 P.3d 799, 804 (Alaska 2015) (concluding that, absent conflicting testimony, attestation of qualified expert that medical malpractice defendants met applicable standard of care was sufficient to support summary judgment in defendants' favor).

antipsychotic medications without consent and over his parents' objections violated the HCDA; and (3) that Providence should be strictly liable for administering medication without consent over the objections of his designated agents.

Bohn argued that his parents were his surrogates until Providence received his power of attorney, after which it should have recognized his mother as his agent.[12] He argued further that even if Providence determined his parents were not acting in his best interest, it should have proceeded to consider Bohn's sister or his friend as the next available surrogates.[13] By having his medical team act as surrogate instead, he contended, Providence had violated the specific provision of the HCDA barring health care providers from acting as surrogates for patients in their care.[14]

In March Providence cross-moved for partial summary judgment on the claims that it administered medications without consent from Bohn, his surrogates, or his agent. Providence argued that these allegations had been resolved in the guardianship proceeding and were therefore barred by the doctrine of collateral estoppel.[15] Bohn

---

[12] *See* AS 13.52.010(b) (providing for nomination of agent through durable power of attorney for health care); AS 13.52.030(a), (c) (governing health care decisions by surrogates and listing persons who may act as surrogate in order of priority).

[13] *See* AS 13.52.030(c).

[14] *See* AS 13.52.030(k) ("Unless related to the patient by blood, marriage, or adoption, a surrogate may not be an owner, operator, or employee of the health care facility where the patient is receiving care.").

[15] The doctrine of collateral estoppel "bars the relitigation of issues actually determined in [earlier] proceedings." *Ahtna, Inc. v. State, Dep't of Transp. & Pub. Facilities*, 296 P.3d 3, 8 (Alaska 2013) (alterations in original) (quoting *Jeffries v. Glacier State Tel. Co.*, 604 P.2d 4, 8 n.11 (Alaska 1979)). Collateral estoppel applies when:

> (1) the party against whom the preclusion is employed was a

(continued...)

opposed. The court stayed the other summary judgment motions pending resolution of this issue. In May it denied Providence's partial summary judgment motion and lifted the stay, concluding that the issues litigated in the guardianship proceeding were not identical to the question of Providence's obligations under the HCDA in its initial treatment of Bohn and the claims were not barred by collateral estoppel.

That same month Bohn filed a Third Amended Complaint. He re-alleged his HCDA claims based on involuntary administration of antipsychotic medications, anti-seizure medications, and steroids. He also re-alleged his claims of false imprisonment, breach of contract, breach of the implied covenant of good faith and fair dealing, and strict liability for nonconsensual administration of medications. In addition he alleged that Providence had violated the HCDA by failing to provide his mother with his medical records upon request when she presented Providence employees the power of attorney and that it had violated the HCDA's prohibition against health care providers acting as surrogates for their patients. Shortly afterward Bohn moved for partial summary judgment as to liability on most of the claims raised in his Third Amended Complaint.

In June Providence opposed Bohn's partial summary judgment motion and cross-moved for summary judgment. It argued that under the HCDA treating physicians were expressly permitted to determine Bohn's best interest in the absence of any other appropriate decision maker and that the statute did not require it to provide health care

---

**15** (...continued)
party to or in privity with a party to the first action; (2) the issue precluded from relitigation is identical to the issue decided in the first action; (3) the issue was resolved in the first action by a final judgment on the merits; and (4) the determination of the issue was essential to the final judgment.

*Id.* (quoting *Matanuska Elec. Ass'n v. Chugach Elec. Ass'n*, 152 P.3d 460, 468 (Alaska 2007)).

that did not fall within applicable "generally accepted health care standards."[16] Providence argued that it had reason to believe Bohn's parents were not acting in his best interest and therefore they were disqualified from acting as his surrogate. It also argued that allowing Bohn's parents to take him home between October 20 and November 14, 2013 would have worsened Bohn's prognosis and even risked his death, and thus would have failed to meet "generally accepted health care standards" under the circumstances.[17] Providence asserted that during this time it was obligated to provide continuing care, which it had, and that it was Bohn's family's responsibility, not Providence's, to arrange a transfer to another hospital.[18]

### 2. Providence's summary judgment motion on immunity

That same month Providence separately moved for summary judgment on the basis of HCDA immunity. It pointed to AS 13.52.080(a)(3), which immunizes a health care provider from liability for declining to comply with a person's health care decision so long as the provider "acts in good faith and in accordance with generally

---

[16] Providence argued that its position was justified by several subsections of the HCDA: AS 13.52.030(f) (allowing primary physician to determine patient's best interest if multiple surrogates have equal priority and are evenly divided over health care decision); AS 13.52.030(h) (allowing health care provider to decline to comply with surrogate's decision if "provider observes that a surrogate is not abiding by the wishes, values, and best interest of the patient"); and AS 13.52.120(e) (requiring health care providers to abide by "generally accepted health care standards" regardless of HCDA's other provisions).

[17] *See* AS 13.52.120(e).

[18] *See* AS 13.52.060(g) (requiring health care provider that declines to comply with authorized decision maker's decision to: (1) inform patient or other decision maker of provider's refusal to comply; (2) provide continuing care pending transfer; and (3) cooperate with decision by patient or authorized decision maker to transfer patient to another facility).

accepted health care standards" and so long as the refusal to comply is "based on a good faith belief that the person then lacked authority" to make health care decisions. Providence supplied a second affidavit from Dr. Johnston stating that the doctors treating Bohn "provided care within the applicable standard of care for family medicine physicians"; that the medications they prescribed "were also well within the applicable standard of care"; that the doctors "genuinely and in good faith believed that [they] were acting in . . . Bohn's best interests"; and that they "genuinely and in good faith believed that . . . Bohn's parents were not acting in his best interests," which the doctors believed "disqualified them from acting as . . . Bohn's surrogates or agents." Providence argued based on this affidavit that it satisfied all the conditions for statutory immunity and that it was therefore entitled to summary judgment.

Bohn opposed, arguing that the HCDA does not deprive agents or surrogates of decision-making authority, or support a good faith belief in their lack of authority, solely on the basis that health care providers believe the agents or surrogates are not acting in the patient's best interest. Bohn pointed out that the HCDA requires health care providers to cooperate with an agent's or surrogate's decision to transfer a patient either to another facility or to the patient's home or to a location chosen by the agent or surrogate;[19] he argued that Providence had clearly violated this section. He further argued that Providence could not have had a good faith belief that his parents lacked authority to make health care decisions because they were aware both of his parents' relationship to him — which would qualify them as surrogates[20] — and, later,

---

[19]     *See* AS 13.52.060(g)(3).

[20]     *See* AS 13.52.030(c)(3).

of the power of attorney that named his mother as his agent.[21]  Bohn characterized Providence's immunity argument as "a claim that physicians can alter the statutory scope of an agent's or a surrogate's authority by believing in good faith that decisions are not in a patient's best interests," which he argued was a misunderstanding of the HCDA that could not entitle Providence to immunity.

### 3.    Transfer of case to Judge Marston

The case was transferred to Judge Marston, who held a status hearing on August 23.   Judge Marston noted that he had presided over Bohn's "extremely emotional" guardianship hearing and gave Bohn an opportunity to ask him to withdraw on that basis.  Bohn declined.  Later in the hearing Judge Marston disclosed that he was in the same book club as Dr. Johnston.  Providence stated that it had no objection to Judge Marston hearing the case based on the disclosure.  Bohn made no objection at the time, nor did he object at any time during subsequent proceedings.

### 4.    Summary judgment decision

Over two days in September 2017 the court held oral arguments on pending motions, including Providence's summary judgment motion based on immunity. Bohn's counsel emphasized that Providence violated the plain terms of the HCDA when it decided to act as Bohn's surrogate[22] and argued that the statute requires health care providers to abide by a surrogate's subjective determination of a patient's best interest even when the surrogate disagrees with the providers. Providence argued that the HCDA permits a provider to disregard a surrogate's directions if the surrogate "is not acting in

---

[21]    *See* AS 13.52.010(b); AS 13.52.030(c).

[22]    *See* AS 13.52.030(k) (barring "an owner, operator, or employee of the health care facility where the patient is receiving care" from being patient's surrogate unless related to patient).

the best interest of the patient"[23] and contended that the HCDA defined "best interest" according to objective factors.[24] At oral argument the court had the following exchange with Bohn's attorney:

> THE COURT: Did they act in bad faith?
>
> [COUNSEL]: No. No, I think they honestly felt that — you're talking about the doctors? They thought they were doing what was right, but you can't . . . .
>
> THE COURT: Wouldn't they be immune then?
>
> [COUNSEL]: No, because you can't take this section and say well, it's not really a mistaken identity situation, the person then lacked authority. It's — the mistake is I didn't know what the law was. Because I didn't know what the law was, I'm immune and I can appoint myself surrogate decision maker in direct violation of statute.

In December the court granted summary judgment to Providence. The court read the HCDA to immunize "health care providers who, while acting in good faith and in accordance with generally accepted health care standards, decline to comply with the health care decision of a person based on the good faith belief that the person lacked authority to make decisions."[25] The court found that there was no dispute about Providence's good faith, pointing to Bohn's counsel's statements at oral argument that the doctors had not acted in bad faith and had "honestly felt that . . . they were doing what was right." The court interpreted Bohn's agreement that the doctors "thought they were doing what was right" as a concession that "doctors can make a good faith mistake

---

[23]     *See* AS 13.52.030(h).

[24]     *See* AS 13.52.390(6) (listing factors in "best interest" analysis).

[25]     *See* AS 13.52.080(a)(3).

of law." Based on that concession, the court concluded Bohn's claim that Providence made a mistake of law when it determined that Bohn's parents lacked authority did not amount to a claim that Providence acted in bad faith. The court held that "[t]herefore . . . Providence should qualify for immunity in accordance with AS § 13.52.080(a)(3)." The court granted summary judgment to the hospital on all of Bohn's claims.

Later that month Bohn moved for reconsideration. He argued that the superior court had erroneously interpreted his counsel's statements at oral argument as conceding that Providence "acted with good faith *in all its conduct towards* [*Bohn*] *or his agent and surrogates*, including any belief as to his agent's or surrogate's lacking authority," when in fact his counsel had conceded only that Providence, "*as a medical provider*, 'honestly felt that what they were doing to [Bohn] was right.' " (Emphasis in original.) He also argued that the court erroneously conflated two separate requirements for immunity under the HCDA: first, that a health care provider "*act*[] *in good faith* and in accordance with generally accepted health care standards,"[26] and second, that it hold "*a good faith belief* that the [agent or surrogate] then lacked authority" to make health care decisions for the patient.[27] (Emphasis in original.) Bohn also argued that "good faith belief" in a surrogate's lack of authority under AS 13.52.080(a)(3) should not extend to mistakes of law. Finally, he argued that even if ignorance of the law were an available defense, Providence's ignorance was "a question of 'culpable mental state,' and not susceptible to summary judgment."

The court denied Bohn's motion for reconsideration in May 2018. Bohn appeals.

---

[26]     *See* AS 13.52.080(a).

[27]     *See* AS 13.52.080(a)(3).

-17-                                                                7517

## III. STANDARD OF REVIEW

"We review a grant of summary judgment de novo, affirming if the record presents no genuine issue of material fact and if the movant is entitled to judgment as a matter of law."[28] When reviewing a grant of summary judgment, we draw "all factual inferences . . . in favor of," and view "the facts . . . in the light most favorable to[,] the party against whom summary judgment was granted."[29] "[A] party seeking summary judgment has the initial burden of proving, through admissible evidence, that there are no [genuine] disputed issues of material fact and that the moving party is entitled to judgment as a matter of law."[30] "Once the moving party has made that showing, the burden shifts to the non-moving party to set forth specific facts showing that [the non-movant] could produce evidence reasonably tending to dispute or contradict the movant's evidence."[31]

"We use our independent judgment to review matters of constitutional or statutory interpretation."[32] To determine the meaning of a statute, we "look to the meaning of the language, the legislative history, and the purpose of the statute and adopt

---

[28] *Hagen v. Strobel*, 353 P.3d 799, 802 (Alaska 2015) (quoting *Kelly v. Municipality of Anchorage*, 270 P.3d 801, 803 (Alaska 2012)).

[29] *Id.* at 802-03 (quoting *Kelly*, 270 P.3d at 803).

[30] *Id.* at 803 (alterations in original) (quoting *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 517 (Alaska 2014)).

[31] *Id.* (quoting *Christensen*, 335 P.3d at 517).

[32] *State v. Planned Parenthood of the Great Nw.*, 436 P.3d 984, 991 (Alaska 2019) (citing *Premera Blue Cross v. State, Dep't of Commerce, Cmty. & Econ. Dev., Div. of Ins.*, 171 P.3d 1110, 1115 (Alaska 2007)).

the rule of law that is most persuasive in light of precedent, reason, and policy."[33] Under our "sliding scale approach to statutory interpretation, . . . 'the plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be' " to convince this court to adopt a different meaning.[34]

## IV. DISCUSSION

Bohn remained hospitalized for many months. But we, like the parties and the superior court, focus only on the time leading up to OPA's appointment as Bohn's guardian — from October 20 through November 14, 2013. Because we have not had occasion previously to interpret the HCDA's immunity provisions, we begin by examining the statutory text.

### A. Providence Is Not Entitled To Immunity Under The HCDA.

#### 1. The statutory text of AS 13.52.080(a)(3) does not support granting Providence immunity for declining to follow Bohn's surrogates' instructions.

Alaska Statute 13.52.080(a) provides:

A health care provider or health care institution that acts in good faith and in accordance with generally accepted health care standards applicable to the health care provider or institution is not subject to civil or criminal liability or to discipline for unprofessional conduct for

. . . .

(3) declining to comply with a health care decision of a person based on a good faith belief that the person then lacked authority.

---

[33] *Alaska Spine Center, LLC v. Mat-Su Valley Med. Ctr., LLC*, 440 P.3d 176, 180-81 (Alaska 2019).

[34] *Id.* at 181 (alterations omitted) (quoting *Adamson v. Municipality of Anchorage*, 333 P.3d 5, 11 (Alaska 2014)).

In its motion for summary judgment, Providence asserted that "given their perception that plaintiff's parents were not acting in his best interests[,] the doctors in good faith and genuinely believed that the parents did not have the authority to act as a surrogate or agent for plaintiff's health care decisions." Providence argued that its doctors had the following good faith beliefs: that Bohn's parents were not acting in Bohn's best interest; that because Bohn's parents were not acting in his best interest, they were disqualified to act as health care surrogates or agents; and that because Bohn's parents were disqualified to act as health care surrogates or agents, they lacked authority. Thus, Providence argued, the hospital — through its doctors — was immune from liability for declining to follow Bohn's parents' decisions. The superior court granted Providence's motion: "[S]ince there is no dispute that the physicians acted in good faith, Providence should qualify for immunity in accordance with AS §13.52.080(a)(3)."

When it granted summary judgment, the court failed to differentiate between the good faith required in the first clause of AS 13.52.080(a) and the second reference to good faith in subsection (a)(3). The first clause authorizes immunity in certain situations for "[a] health care provider or health care institution that acts in good faith and in accordance with generally accepted health care standards."[35] But subsection (a)(3) requires a second level of good faith related to the surrogate's or agent's authority: To be entitled to immunity for declining to follow the instructions of a surrogate or agent, the medical providers must also have "a good faith belief that the person *then lacked authority*."[36] While it was undisputed that Bohn's providers were acting in good faith generally, the court overlooked that they were required to both act in good faith generally and have a good faith belief that the surrogate or agent lacked authority.

---

[35] AS 13.52.080(a).

[36] AS 13.52.080(a)(3) (emphasis added).

Providence's belief that Bohn's parents were stripped of authority because they were not acting in his best interest is not sufficient under subsection (a)(3).

By conflating the two levels of good faith, Providence's argument undermines the role of the surrogate or agent — a role the HCDA was intended to strengthen.[37] Providence argues that Bohn's doctors should be immunized because of their good faith belief that Bohn's parents lacked authority as a result of making decisions that the doctors believed were not in Bohn's best interest. But as Bohn argues, this interpretation of AS 13.52.080(a)(3) risks turning it "into the subsection that ate the statute." Under Providence's interpretation any provider who disagreed with a surrogate's or agent's direction could plausibly assert a "good faith" belief that the surrogate or agent is not acting in the patient's best interest. From the provider's perspective, if the surrogate or agent were acting in the patient's best interest, the surrogate or agent would have made the same decision as the provider. And if the surrogate or agent did not make the same decision, the provider would then be able to assume that because the surrogate or agent was not acting in the patient's best interest, that person lacked authority to direct the patient's care. As a result any provider in that situation would be free to ignore any direction from the surrogate or agent without fear of civil or criminal liability.

When we interpret a statute, we "look to the meaning of the language, the legislative history, and the purpose of the statute and adopt the rule of law that is most

---

[37]     *See* Ch. 83, § 1(b), SLA 2004 ("It is the intent of this Act to (1) establish the right of a patient to control the patient's own health care decisions . . . ."); AS 13.52.010(b) (allowing adults to authorize agent to make healthcare decisions through durable power of attorney); AS 13.52.030 (authorizing surrogate to make health care decisions for adult under certain circumstances).

persuasive in light of precedent, reason, and policy."[38]  "[W]e use 'a sliding scale approach to statutory interpretation, in which "the plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be" ' " to persuade this court to adopt a different meaning.[39]  We must also interpret a statute as a whole.[40]

We must determine whether the good faith belief described in .080(a)(3) refers to any good faith belief held by a provider, or whether it requires a more specific belief about the decision-maker's legal authority as a surrogate or under a power of attorney.  Although the plain text of the statute does not limit the range of acceptable "good faith belief[s] that the person then lacked authority," it must be interpreted to avoid eliminating the role of a surrogate or agent altogether.  Because .080(a)(3) includes a second level of good faith in addition to that which precedes the enumerated subsections, the most natural reading is that subsection (a)(3) requires a good faith belief specific to the individual's legal authority to act as a surrogate or agent.

Looking at AS 13.52.080(a) as a whole and considering all of its numbered subsections supports this interpretation.  The provision immediately preceding subsection (a)(3) provides immunity for providers who *comply* with a health care decision "based on a good faith belief that the person has authority to make a health care decision for a

---

[38]     *Alaska Spine Center, LLC*, 440 P.3d at 180-81.

[39]     *Id.* (quoting *Adamson*, 333 P.3d at 11).

[40]     *McDonnell v. State Farm Mut. Auto. Ins. Co.*, 299 P.3d 715, 721 (Alaska 2013) ("[W]e must, whenever possible, interpret each part or section of a statute with every other part or section, so as to create a harmonious whole." (quoting *State, Dep't of Commerce, Cmty., & Econ. Dev., Div. of Ins. v. Progressive Cas. Ins. Co.*, 165 P.3d 624, 629 (Alaska 2007))).

patient, including a decision to withhold or withdraw health care."[41] The presumption of consistent usage "states that words are 'presumed to bear the same meaning throughout a text.' "[42] It is unlikely that the legislature intended that the relevant "authority" in subsection (a)(2) was limited to "authority to make a health care decision for a patient" but that the authority described in the very next subsection was broad enough to cover any good faith belief about an individual's authority. Taken together, subsections (a)(2) and (a)(3) seem intended to protect health care providers who accidentally follow health care decisions made by the wrong people.

Providence also argues that other sections of the HCDA allow providers to refuse to comply with surrogate decision-making in certain contexts, such as if the provider believes the surrogate is not "abiding by the wishes, values, and best interest of the patient"[43] or if the decision would require medically ineffective care.[44] But in those circumstances when a provider is entitled to ignore a surrogate's instruction, it is not because the provider believes the surrogate "lacks authority"; it is because the provider believes that the instruction (for example) "requires medically ineffective health care."[45] If providers were already granted immunity for failing to follow instructions in those circumstances, there would seem to be no need for the legislature to have included

---

[41]     AS 13.52.080(a)(2).

[42]     *Forrer v. State*, 471 P.3d 569, 597 (Alaska 2020) (quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 170 (2012)).

[43]     AS 13.52.030(h).

[44]     AS 13.52.060(f).

[45]     *Id.*

subsection (a)(3)'s requirement that a provider have "a good faith belief that the person then lacked authority."[46]

The legislative history supports interpreting AS 13.52.080(a)(3) as referring to a provider's belief about the surrogate's legal decision-making authority. The original draft of AS 13.52.080(a) provided immunity to "[a] health care provider or health care institution that makes reasonable efforts, with a level of diligence appropriate to the seriousness and urgency of the situation, to ensure the validity of an advance Health Care Directive or a person's assumption of authority to make health care decisions for a patient."[47] This focus on "the validity of an advance Health Care Directive or a person's assumption of authority" suggests that the statute is primarily concerned with an individual's authority under a power of attorney or as a surrogate. While this language was eliminated in the 2005 amendment[48] and replaced with "[a] health care provider or health care institution that acts in good faith and in accordance with generally accepted health care standards,"[49] this change did not appear motivated by a change in the statute's purpose. Rather, the goal was to remove the "duty of investigation" earlier placed upon health care providers.[50] This suggests that providers were initially charged with investigating the validity of the Health Care Directive or other source of decision-making authority but that since 2005 the provider's good faith belief in the individual's decision-

---

[46]     AS 13.52.080(a)(3).

[47]     Former AS 13.52.080 (2004).

[48]     *See* Ch. 103, §§ 8, 9, SLA 2006.

[49]     AS 13.52.080(a).

[50]     *See* Minutes, Sen. Judiciary Standing Comm. Hearing on H.B. 442, 24th Leg., 1st Sess. (May 2, 2006) (testimony of Jacqueline Tupou, Staff to Representative Bruce Weyhrauch).

making authority has been sufficient. However, the legislature's focus in drafting the immunity provision was on the source of the individual's authority, not whether the provider was permitted to ignore an individual instruction under a separate provision of the HCDA.

We therefore conclude that the most persuasive interpretation of AS 13.52.080(a)(3), based on its plain language, legislative history and "in light of precedent, reason, and policy,"[51] is that the immunity it provides is limited to good faith mistakes about an individual's legal authority as an agent or surrogate.[52]

Providence never argued to the superior court that it in good faith believed Bohn's parents were not his surrogates or that they lacked authority under the power of attorney.[53] Instead Providence alleged it believed that Bohn's parents lacked authority because they were not acting in Bohn's best interest. That belief, even if held in good faith, exceeds the scope of protection offered by AS 13.52.080(a)(3). Accepting Providence's argument at face value would functionally eliminate the role of agent or surrogate, which is contrary to the HCDA's purpose. Providence is not entitled to

---

[51]     *Alaska Spine Center, LLC v. Mat-Su Valley Med. Ctr., LLC*, 440 P.3d 176, 180-81 (Alaska 2019).

[52]     This interpretation closely resembles the interpretation that Bohn advocates in his pleadings, although it is not identical. For example, Bohn argues that AS 13.52.080(a)(3) immunity can never cover mistakes of law. There is no reason why all mistakes of law should be excluded from AS 13.52.080(a)(3) immunity, as long as the mistakes of law are related to whether a person is authorized to serve as an agent or surrogate. For example, our interpretation of AS 13.52.080(a)(3) may cover a health care provider who, through a faulty recollection or understanding of AS 13.52.080(c), identifies the wrong family member as the legally prioritized surrogate.

[53]     If Providence did believe Bohn's parents were not his surrogates or lacked authority under the power of attorney, it may raise that argument on remand.

summary judgment on the issue of immunity, and the superior court's grant of summary judgment is reversed and remanded.

Providence may nonetheless succeed on the merits if it can show that it declined to follow Bohn's parents' instructions only in statutorily permitted contexts. Under the HCDA, a health care provider is not required to comply with a surrogate's instructions if the provider observes that the surrogate is not abiding by the wishes, values, and best interest of the patient.[54] Similarly, the HCDA allows health care providers to decline to comply with health care instructions that offend their moral or medical codes.[55] If Providence can show that it declined to follow Bohn's parents' instructions only in statutorily permitted contexts, such as after observing that Bohn's parents were not abiding by Bohn's wishes, values, and best interest or that those instructions required medically ineffective health care, it may successfully prevail against Bohn's causes of action without recourse to the immunity provisions.

### 2. Providence is not entitled to immunity for failing to transfer Bohn.

Alaska Statute 13.52.060(g) places responsibilities on a health care provider that declines to comply with a surrogate's or agent's decision. The provider must inform the patient and any person authorized to make health care decisions for the patient that it is refusing to comply with the decision;[56] must continue providing care to the patient until the patient is transferred;[57] and must "cooperate and comply with a decision by the patient or a person then authorized to make health care decisions for the patient to

---

[54]    AS 13.52.030(h).

[55]    AS 13.52.060(e), (f).

[56]    AS 13.52.060(g)(1).

[57]    AS 13.52.060(g)(2).

transfer the patient to another health care institution, to another health care facility, to the patient's home, or to another location."[58]

Bohn's parents repeatedly, and at least once in writing, told Providence that they wished to remove him from Providence and transfer him to a different facility. On November 9 Bohn's mother sent Providence a letter seeking "emergency evacuation" of Bohn to "any other medical health facilities."[59] A Providence risk management specialist wrote back that "the physicians treating him are exploring the option of transferring him to another facility but are awaiting the results of tests" and that "[t]he transfer of a patient is something that is done by the physician and can only occur if there is a physician willing to accept the patient as their own at the new facility." Providence then directed Bohn's mother "back to the physician treating [Bohn] to see what the status is" on the pending test results.

Providence now argues that it was up to Bohn's family to find a physician at another facility willing to take over Bohn's care, and its duty to cooperate with a transfer would take effect only once the family had done so. But the only written response Providence provided to the parents specified the opposite: "The transfer of a patient is something that is done by the physician."[60] Although Bohn repeatedly raised and argued this claim before the superior court, the summary judgment order contained no conclusions on whether Providence had met its obligations under AS 13.52.050(g).

---

[58]     AS 13.52.060(g)(3).

[59]     Bohn's mother had previously asked that Bohn be transferred either to the Alaska Psychiatric Institute or to Alaska Regional Hospital.

[60]     We also question the practical likelihood that an individual is capable of arranging a transfer or admission to another facility.

Whether Providence fulfilled its statutory duty after it declined to follow Bohn's parents' instructions thus presents an issue of material fact. And nothing in AS 13.52.080(a) appears to extend immunity to providers who fail to fulfill this duty after declining to follow instructions. Summary judgment granting immunity to Providence on that claim is therefore reversed and remanded for further proceedings.

**3. Providence is not entitled to immunity for appointing itself Bohn's surrogate.**

Bohn argues that Providence violated another section of the HCDA by appointing itself as his surrogate after deciding that his parents could no longer act as surrogates or agents and before a guardian was appointed. Alaska Statute 13.52.030(k) specifically prohibits employees of the treating health care facility from acting as surrogates unless related to the patient.[61] And Bohn offered evidence that other individuals who would have qualified as surrogates under AS 13.52.030(c) and (d)'s order of priority — his sister and his close friend — were available and willing to act as surrogates.

Nothing in AS 13.52.080(a) appears to grant immunity to providers that violate the prohibition on health care providers acting as surrogates themselves. And Bohn raised and repeatedly argued his claim that Providence should be liable for appointing its own providers as his surrogates, even temporarily. There remains an issue of material fact about whether Providence may be liable under AS 13.52.030(k). It was error to apply the immunity provision to this claim. Summary judgment is reversed and remanded for consideration of whether Providence may be liable under AS 13.52.030(k).

---

[61] AS 13.52.030(k) ("Unless related to the patient by blood, marriage, or adoption, a surrogate may not be an owner, operator, or employee of the health care facility where the patient is receiving care.").

**B. Judge Marston Is Not Disqualified.**

Bohn requests an order disqualifying Judge Marston. Bohn urges that the judge be disqualified because he was in a book club with Dr. Johnston, "Providence's only source of evidence on the issue of good faith," and because the judge's role in the guardianship proceeding raises questions about his impartiality. Bohn also argues that treating his attorney's "non-technical use of 'good faith' at oral argument" as a concession of the issue is "egregious" and that Judge Marston seemed concerned "first and foremost to protect health care providers," further calling into question his ability to be impartial.

Providence responds that Bohn was aware of Judge Marston's connection to Dr. Johnston during trial court proceedings and failed to object then. Providence argues that failure to move to disqualify a judge constitutes waiver of the opportunity to do so.[62]

Alaska's Code of Judicial Conduct provides that "a judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned,"[63] although parties can waive the grounds for disqualification in most circumstances.[64] Alaska Statute 22.20.020(a) provides additional grounds for

---

[62] *See* AS 22.20.020(b) (providing that failure to object results in waiver of certain bases of disqualification).

[63] Alaska Code Jud. Conduct Canon 3 E(1).

[64] Alaska Code Jud. Conduct Canon 3 F(1) (permitting waiver unless judge "has a personal bias or prejudice concerning a party or a lawyer," when "judge believes that he or she cannot be fair and impartial, or when a waiver is not permitted under AS 22.20.020").

disqualification.[65] The statute specifically provides that if a judge discloses grounds for disqualification under subsections (2), (5), (6), (7), or (8), a party waives disqualification by failing to object.[66]

Bohn declined his opportunity to disqualify Judge Marston at the August 2017 hearing when Judge Marston offered him the opportunity based on the fact that he had presided over the guardianship proceedings. Later in the same hearing Judge Marston mentioned that he and Dr. Johnston were in the same book club. Bohn made no objection at that point or during the rest of the status hearing. Nor did he later move to disqualify Judge Marston on this basis, or any other basis, either during summary judgment proceedings or in his motion for reconsideration. Bohn therefore waived his opportunity to disqualify Judge Marston.

## V. CONCLUSION

The superior court's grant of summary judgment is REVERSED and REMANDED for further proceedings. Bohn's request to disqualify Judge Marston from presiding over the proceedings on remand is DENIED.

---

[65] Alaska Statute 22.20.020(a) forbids a judge from participating in a matter in which: (1) the judge is "a party"; (2) is "related to a party or a party's attorney by consanguinity or affinity within the third degree"; (3) is a "material witness"; (4) the judge's family stands to benefit financially or "has a direct financial interest in the matter"; (5) the judge previously represented or professionally counseled a party within the last two years; (6) previously represented a person against a party within 2 years; (7) a party's attorney previously represented the judge or a person who litigated against the judge within 2 years; (8) the judge's former law firm represented or professionally counseled either party within the last 2 years; or (9) the judge feels that, "for any reason . . . a fair and impartial decision cannot be given."

[66] AS 22.20.020(b) ("The disqualifications specified . . . may be waived by the parties and are waived unless a party raises an objection.").